# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. CHRISTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. <u>06-2787 T/P</u> |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Michael J. Christon appeals from a final decision of the Commissioner of Social Security[1] (the "Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u>, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 <u>et seq.</u> The appeal was referred to the United States Magistrate Judge for a report and recommendation. Based on the entire record in this case, the court proposes the following findings of fact and conclusions of law and recommends that the Commissioner's decision be remanded for further

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, while this appeal was pending. Therefore, Commissioner Astrue has been substituted for the former Commissioner, Jo Anne B. Barnhart, as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g).

proceedings consistent with this report and recommendation.

## I. PROPOSED FINDINGS OF FACT

### A. Procedural History

Christon filed his application for disability insurance and SSI benefits on May 8, 2003.[2]  (R. at 79-81).  He alleged a disability onset date of December 14, 2001, citing heart problems, use of a defibrillator, and injuries to his left arm and leg.  (R. at 79, 148, 157).  The Social Security Administration ("SSA") denied his application initially on September 29, 2003, (R. at 70-73), and upon reconsideration on August 23, 2004.  (R. at 74-75). Christon requested a hearing before an Administrative Law Judge ("ALJ"), and one was scheduled before ALJ Sheldon P. Zisook on April 5, 2005.  (R. at 41-44).  Christon did not appear at the hearing because he had been hospitalized, and it was rescheduled for June 21, 2005.  (R. at 398-418).  Following the hearing, ALJ Zisook issued a written decision on January 24, 2006, denying Christon's claims.  (R. at 12-33).  After the Appeals Council denied his request for review on September 14, 2006, (R. at 4-7), Christon filed the instant appeal in the Western District of Tennessee on November 15, 2006.

---

[2]Christon had previously received disability benefits from August of 1989 until July of 1991.  (R. at 81, 167).  He had also received worker's compensation benefits that affected his previous disability insurance benefits.  (Id.).  Christon had applied again for disability insurance and SSI benefits, which were denied in June of 1997.  (R. at 15).  He had also applied for benefits on January 27, 2002, and his application was denied initially on April 23, 2002, and on reconsideration in August of 2002.  (R. at 15, 166-67).

**B.  Medical History**

Christon was born on December 22, 1960. (R. at 79). He is 5'11" tall and weighs 195 pounds. (R. at 237). He was admitted to Baptist Memorial Hospital ("Baptist") from December 20, 2001, until December 28, 2001, for congestive heart failure symptoms. (R. at 193). His medical records from that hospital visit indicated cigarette smoking, organic heart disease including cardiomyopathy possibly infiltrative with normal coronary arteriogram by history, ventricular tachycardia, and guidant automatic implantable cardioverter defibrillator ("AICD" or "ICD"), hyperlipidemia, elevated homocystine, positive anticardiolipin antibody IgG, fluorescent antinuclear antibody negative, and borderline abnormal urine immunoelectrophoresis. (Id.). An echocardiogram ("ECHO") suggested a low ejection fraction and infiltrative cardiomyopathy. (Id.). Christon reported a normal coronary arteriogram from the previous year, and he had nonsustained ventricular tachycardia and evidence of atrial fibrillation in the past. (Id.). Christon was placed on medications, to which he responded well, and an AICD was implanted because of nonsustained ventricular tachycardia. (Id.). Christon was taking the following medications upon discharge: Lowenstein 20 mg, Coreg 3.125 mg, Plavix 75 mg, Lanoxin 0.625 mg, Folic acid 3 mg, Magnesium 40 mg, and Nitroglycerin spray. (R. at 194).

A chest x-ray taken on December 27, 2001, showed that

Christon's cardiac silhouette was enlarged yet unchanged, and bilateral interstitial edema was present. (R. at 207). His mediastinum was within normal limits, no pleural effusions were seen, and no infiltrate or pneumothorax was present. (Id.). The diagnostic impression was congestive heart failure. (Id.).

On January 9, 2002, Christon was treated at the Stern Cardiology Center ("Stern Center") for shortness of breath by Dr. Mark A. Coppess. (R. at 296). He weighed 203 pounds, his blood pressure was 142/88, and his heart rate was seventy bpm. (Id.). His systems were normal, and his ICD programmer was within normal limits with no high rate detections. (R. at 296, 327). The diagnostic assessment was cardiomegaly, now with congestive heart failure symptoms with increased dyspnea on exertion and orthopnea, and SP dual chamber Guidant ICD with appropriate function on programmer evaluation. (R. at 296).

On January 30, 2002, Christon was treated at the Stern Center for a follow-up of his cardiomyopathy. (R. at 292). Christon stated that he was doing well, but he continued to have shortness of breath when he exerted himself. (Id.). An electrocardiogram ("EKG") showed ventricular pacing with an underlying sinus rhythm and ventricular rate of seventy-three. (Id.). The diagnostic assessment was cardiomypathy and hypertension. (Id.).

On February 11, 2002, Christon was again treated at Baptist for chest pain, shortness of breath, and nausea. (R. at 199). He

had a history of congestive heart failure, hypertension, coronary artery disease, and AICD placement. (R. at 200). His symptoms included dizziness, headaches, chest pain, shortness of breath, cough with white sputum, nausea, and pedal edema. (Id.). On February 13, 2002, a chest x-ray showed persistent cardiomegaly with interval improvement of congestive heart failure with mild failure persisting. (R. at 208).

On March 29, 2002, Christon was seen at the Stern Center because he thought he may have pulled out the lead wires from his pacemaker. (R. at 286-87). Christon stated that he had lifted a heavy air conditioning unit four or five days previously and felt a pull in his left upper chest. (R. at 286). Since then, he felt like his heart rate had been intermittently irregular. (Id.). Upon examination, it was determined that Christon's heartbeat was regular, but his S3 was occasionally positive, and his point of maximal impulse was displaced laterally. (Id.). Otherwise, his systems were normal. (Id.). An EKG showed that his ventricular pacing was at a rate of seventy-three. (Id.). The diagnostic impression was cardiomyopathy, congestive heart failure, hypertension, and permanent pacemaker/defibrillator. (Id.). Christon reported that he was not having any symptoms with the shocks he received. (R. at 287). The sensitivity on Christon's AICD was adjusted to enable it to shock only on ventricular tachycardia, rather than on both ventricular tachycardia and sinus

tachycardia.  (Id.).

On April 2, 2002, a Physical Residual Functional Capacity ("RFC") Assessment was completed for Christon.  (R. at 215-22). The primary diagnosis was cardiomyopathy with congestive heart failure, and the secondary diagnosis was ventricular arrhythmia. (R. at 215).  The RFC stated that Christon could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of two hours in an eight hour workday, sit for a total of about six hours in an eight hour workday, and his ability to push and/or pull was unlimited. (R. at 216).  Christon could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  (R. at 217).  Christon did not suffer from any manipulative, visual, communicative, or environmental limitations.  (R. at 218-19).

On May 22, 2002, Christon was screened at the Stern Center for his ability to participate in a research study, the A-Heft study, with Dr. Frank A. McGrew, III.  (R. at 284-85, 289).  The study involved testing the effectiveness of two medications, Hydralazine and Isosorbind, that had been combined into a single pill, on African-Americans with heart failure.  (R. at 285).

On May 23, 2002, Christon was treated for palpitations and ICD shock at the Stern Center by Dr. Coppess.  (R. at 281-82). Christon reported receiving multiple shocks since his last clinic visit, and he had received two shocks five days previously while

out of medications. (Id.). His palpitations were triggered by exertion, and he reported occasional dyspnea on exertion without shortness of breath at rest or chest pain. (Id.). Christon reported that he was unable to pay for his medications. (Id.). A physical examination showed that Christon's systems were normal. (Id.). The diagnostic impression was a history of cardiomegaly and congestive heart failure, now with mild heart failure symptoms, status post ICD with appropriate function and a history of ventricular tachycardia, recurrent inappropriate ICD shocks for supra ventricular tachycardia ("SVT") and episodes of paroxysmal atrial fibrillation and atrial tachycardia documented triggering ICD shocks, and medical noncompliance secondary to inability to pay for medications. (Id.).

Christon was admitted to Baptist from June 13, 2002, until June 17, 2002, with congestive heart failure, cardiac arrhythmia, right lower quadrant pain lasting for five days, constipation, and intermittent nausea and vomiting. (R. at 224, 228). Christon was also experiencing some chest discomfort and palpations, shortness of breath, and dark urine. (R. at 228). A physical examination showed no detectable cardiac murmur, and his abdomen was flat, soft, not distended, his bowel sounds were present, there was no heptasplenomegaly, and he had minimal tenderness to deep palpation in the right lower quadrant with no mass. (R. at 229). He was diagnosed with persistent right lower quadrant pain of

indeterminate origin rule out right colon lesion, congestive heart failure with paroxysmal atrial fibrillation, and a computed tomography ("CT") scan revealed a 2.7 cm fat density mass in the mid-right psoas muscle of uncertain etiology. (Id.).

On June 13, 2002, a chest x-ray revealed that Christon's heart was enlarged, his pulmonary vasculature was within normal limits, and there was no pneumothorax, pleural effusion, or consolidative air space disease. (R. at 232). The diagnostic impression was cardiomegaly without acute findings. (Id.).

On June 14, 2002, a CT scan of Christon's abdomen and pelvis was conducted. (R. at 230). It showed a 5 mm hypodense lesion within the left lobe of the liver that likely represented a small cyst. (Id.). Christon's spleen, pancreas, and adrenals were normal, but there was an 8 mm cystic lesion in his mid-right kidney and a 5 mm cystic lesion in the inferior pole of the left kidney that likely represented renal cysts. (Id.). Additionally, there was a gaseous distension of the colon and a 2.7 cm predominantly fat density mass within the mid-right psoas muscle with some internal stranding. (Id.). The lesion was indeterminate but may have been an intramuscular lipoma. (Id.). The diagnostic impression was a 2.7 cm mass in the right psoas muscle, normal appendix, and indeterminate lesions in the liver and kidney probably representing cysts. (R. at 231).

On June 15, 2002, an abdominal ultrasound showed no ascites or

splenic enlargement, presence of numerous gallbladder stones without gallbladder wall thickening or positive Murphy's sign, no bile duct dilation, and no focal defects within the liver. (R. at 233). Additionally, Christon's pancreas and abdominal aorta were normal, and his kidneys showed no obstruction, stone disease, or solid masses. (Id.). The diagnostic impression was cholelithiasis and right renal cyst. (Id.).

An undated echocardiography report found that Christon's cardiac valves were normal. (R. at 234). His right atrium and ventricle were normal, but his right ventricle free wall appeared hypertrophied. (Id.). His left atrium was normal, but his left ventricle was abnormal as the ventricular wall muscle thickness was severely increased. (Id.). The qualitative estimation of the left ventricular ejection fraction yielded approximately 55%. (Id.). The aortic room was normal, and there were no signs of tamponade. (Id.). There was a small pericardial effusion, and there had been a change since the last echocardiographic study. (Id.). The diagnostic conclusions were an abnormal left ventricle - severely hypertrophied, abnormal right ventricle chamber - hypertrophied right ventricular free wall, a small pericardial effusion, and a significant change since the last study. (Id.).

Upon discharge from Baptist, Christon was diagnosed with organic heart disease complex, noting that his defibrillator was functioning well, he had paroxysmal atrial fibrillation, normal

ejection fraction, and small pericardial effusion. (R. at 224).
He was also diagnosed with abdominal pain, a gallstone,
carcinoembryonic antigen, and a CT scan revealed liver and renal
cysts. (Id.). Finally, he was diagnosed with anticoagulation with
coumadin, hypokalemia, financial problems with medications, and
amiodarone therapy. (Id.). Christon's chief complaints upon
admission had been abdominal pain, chest pain, and shortness of
breath, but the cause of his abdominal pain was not clear. (Id.).

On April 30, 2003, Christon was admitted to the Regional
Medical Center at Memphis ("the Med") Emergency Room because he had
been experiencing chest pain for two days and his defibrillator had
gone off the previous month. (R. at 243). He was also
experiencing shortness of breath. (Id.). A chest x-ray showed
mild cardiomegaly, normal mediastinum, no evidence of infiltrate or
effusion, and normal bones and soft tissues. (R. at 247).

On May 12, 2003, Disability Examiner Elizabeth McKinley
completed a Field Office Disability Report. (R. at 166-69). She
observed that Christon had difficulty breathing and using his
hands. (R. at 168). She stated that he could not extend the
fingers of his left hand, he seemed slightly shortwinded, and he
became "tired out" by the two-hour interview. (Id.).

On May 14, 2003, Christon received treatment at Methodist
LeBonheur Healthcare ("Methodist") for chest pain and dyspnea. (R.
at 252-57). A chest x-ray showed that his heart was enlarged, and

there was vascular congestion with bilateral perihelar edema. (Id.).  An echocardiography report included the following diagnostic impressions: left ventricular systolic function was normal, left ventricular systolic wall motion was normal with ejection fraction of 50%, small pericardial effusion, left atrium moderately dilated, right ventricular anterior systolic wall motion was normal, moderate mitral regurgitation and mild tricuspid regurgitation, normal aortic root size, no evidence of clot or vegetation, aortic, mitral, and tricuspid valves appeared normal, moderate concentric left ventricular hypertrophy, cannot rule out small membranous ventricular septal defect, and AICD in right heart.  (R. at 259-60).

On July 17, 2003, Tennessee Disability Determination Services ("DDS") Consultant Dr. Barry Siegel examined Christon.  (R. at 261-65).  Christon's history revealed the following:

> This is a right-handed 42-year-old black male, who notes his worst problem is "heart."  He said he has had hypertension for about 10-15 years, which has been under poor control.  He said he has had supraventricular and ventricular arrhythmias since 1989.  He said he was born with an enlarged heart and a heart murmur.  The AICD was placed in 2001.  He said that Persantine and Thallium testing on the Monday prior to this exam revealed a scar on his heart.  He said he had a CAT scan of his chest on the morning of this exam.  He said he had several hospitalizations for the chest pain over the last few years.  He complains of left lower sternal chest pain. It is precipitated by a lot of activity.  He notes easy fatigability.  The chest pain is a "sharp pain."  It is associated with a throbbing headache.  It is not associated with diaphoresis or nausea.  He does get short of breath with it.  It is occasionally associated with pain of the distal medial left thigh and proximal medial

left calf. It is better with relaxation in about 2 or 3 hours. He said he was diagnosed with congestive heart failure in 2001. He notes mild daily pedal edema at the end of the day. He notes still walking to the restroom at night. He questionably quits breathing during his sleep. His walking is limited to about 150 feet, at which point he must stop due to DOE [dyspnea on exertion]. He said he fell into a conveyer belt resulting in soft tissue damage to both legs and a fracture to his left forearm. He underwent bone and skin and muscle graft to the forearm in 1989, due to the injury. He said he is unable to extend left digits or supinate the left forearm.

He said he has had about 10 hospitalizations for his heart problems his entire life. He denies any history of diabetes mellitus. . . .

He denies smoking for the past six months, previously smoked two-thirds pack per day. He denies drinking for about six months. He previously drank 3 to 4 beers (12 ounces each) 2 or 3 times weekly. He has an eighth grade education. He said his reading and writing is "pretty good." He painted truck ramps at a tire repair facility for seven months till December 2001, at which time he was hospitalized in order to insert the AICD. He repaired tires for a different company for about one-and-a-half years till 2000. He ran errands and cleaned up cars at East Car Lab for several months from 1999 to 2000. He lives with girlfriend and 11-year-old son. He cooks, washes dishes, occasionally vacuums, and loads a washer and dryer. He denies doing any yardwork. . . .

(R. at 262-63). Additionally, Christon stated that he took his medications intermittently because he could not afford them. (R. at 263). His medications included Atenolol 25 mg, Lasix 40 mg, Captopril 15 mg, Enteric Aspirin 325 mg, Magnesium, Zocor, Potassium, and Plavix. (Id.). He stated that he had poor visual acuity, and he denied having seizures or blackouts. (Id.).

A physical examination showed that the vision in Christon's right eye was 20/20 and 20/30 in his left eye. (R. at 264). His

blood pressure was 130/100, and his pulse was fifty-six. (Id.).
Christon was muscular and exerted fair to poor effort during the
examination. (Id.). Christon's nose, throat, and lungs were
clear. (Id.). His respiration and respiratory rate had frequent
premature contractions, his pulses were full, and he had no edema.
(Id.). Christon's abdomen had no edges or masses. (Id.). A five
by eight inch depressed area was present over Christon's right
lateral thigh and a five by five inch depressed area was present
over the left medial thigh. (Id.). Both areas were covered with
skin grafts. (Id.). Donor skin grafts had been removed from his
proximal anterior thighs. (Id.). Christon's knees were without
heat, swelling, or crepitation, his right knee had 120 degrees of
flexion, and his left knee had seventy degrees of flexion with poor
effort. (Id.). His back had twenty degrees side bending and
extension with full flexion. (Id.). Christon's heel-walk, toe-
walk, and tandem-walk were normal, and he was able to squat while
holding his left leg slightly in front of his body, which limited
his flexion. (Id.). There were multiple surgical scars on the
dorsal and radial aspect of the left forearm and medial to the left
elbow. (Id.). Christon's left elbow had ten degrees supination,
seventy degrees pronation, 125 degrees flexion, and zero degrees
extension. (Id.). Dr. Siegel noted that the range of motion of
the digits of the left hand was attached. (Id.). Both of
Christon's biceps measured thirty-four inches in circumference, and

his grip was 5/5 on the right and 4/5 on the left. (Id.). There were marked calluses on his right palm and mild to moderate calluses on his left palm. (Id.). Cranial nerves II through XII were intact, and Christon's deep tendon reflexes were 1+ biceps, very trace patellars, and trace Achilles bilaterally. (Id.).

A left hand x-ray revealed that Christon's thumb was hyperextended at the interphalangeal joint, the index finger was flexed at the distal interphalangeal joint, the three ulnar digits were flexed and/or radially deviated at the metacarpophalangeal ("MCP") joints. (R. at 265). A small metallic density was noted in the thenar web, and the bones of his left hand were otherwise unremarkable. (Id.). A left elbow x-ray showed healed fractures at the proximal half of the radius with moderate sclerotic changes in the elbow joint. (Id.).

Dr. Siegel's assessment was history of moderate cardiomegaly with history of congestive heart failure status post pacemaker/AICD placement and status post left upper extremity and bilateral lower extremity trauma with moderate residual impairment of the left upper extremity. (R. at 265). Dr. Siegel found that Christon could "probably occasionally or frequently lift and carry about [fifty] pounds, and stand, walk or sit for about six hours in a workday." (Id.).

On September 25, 2003, Dr. K. Shannon Tilley completed a Physical RFC Assessment for Christon. (R. at 266-71). The primary

diagnosis was heart disorder, the secondary diagnosis was loss of movement in left fingers, and other alleged impairments included trauma to legs. (R. at 266). Dr. Tilley found that Christon could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and his ability to push and/or pull was unlimited. (R. at 267). Dr. Tilley based these limitations on Christon's heart problems and leg and left arm trauma. (Id.). Dr. Tilley also found that Christon did not have any postural limitations, but he was limited in his fingering ability. (R. at 268). Christon had no other manipulative limitations. (Id.). Dr. Tilley found that Christon had no visual or communicative limitations. (R. at 269). Finally, Dr. Tilley found that Christon should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, but he had no other environmental limitations. (R. at 270).

From January 26, 2004, until February 4, 2005, Christon continued to see Dr. McGrew and Dr. Coppess at the Stern Center. (R. at 273-76, 278, 280, 311-12, 394, 396). On January 26, 2004, he was treated for mild exertional dyspnea. (R. at 280). A physical examination showed that Christon's systems were normal, and Dr. McGrew noted that an ECHO performed in October showed that his ejection fraction had improved to near normal. (Id.). Dr.

McGrew also noted that he thought that Christon may have been off of some of his medications and that Christon had two ventricular function episodes over the last few months.  (<u>Id.</u>).

On April 22, 2004, Christon was treated for exertional dyspnea and occasional palpitations.  (R. at 278).  Dr. McGrew noted that ICD interrogation showed atrial fibrillation/flutter with anti-tachycardia pacing ("ATP") then a thirty-one joule shock.  (<u>Id.</u>). The AICD was reprogrammed to three zones for more ATP.  (<u>Id.</u>). Physical examination showed that Christon's systems were normal. (<u>Id.</u>).  An echocardiography report showed that Christon had a normal left ventricular size with mildly depressed global systolic function, severe concentric left ventricular hypertrophy, mild mitral regurgitation with mildly dilated left atrial size, trace tricuspid regurgitation with normal right atrial and right ventricular size, no pericardial effusion, and no major change in the prior study.  (R. at 311).

On April 29, 2004, Christon was treated for palpitations.  (R. at 276).  Christon reported recurrent palpitation and ICD therapy. (<u>Id.</u>).  Christon denied having chest pain or shortness of breath. (<u>Id.</u>).  Physical examination showed that Christon's systems were normal.  (<u>Id.</u>).  An EKG showed that his underlying sinus rhythm was sixty beats per minute with atrial synchronous ventricular pacing, and his QT corrected interval ventricular paced 480 milliseconds. (<u>Id.</u>).  Dr. Coppess' assessment was status post ICD with recurrent

inappropriate ICD shocks for atrial fibrillation and atrial flutter, left ventricle ejection fraction 40%, and QT interval 480 milliseconds. (<u>Id.</u>).

On May 20, 2004, Christon was treated for past paroxysmal atrial fibrillation, electrolyte imbalance, hyperlipidemia, hypertension, arrhythmias on Amiodarone, and high lipids. (R. at 275). His physical examination was normal, and Dr. McGrew noted that Christon's ejection fraction had improved significantly. (<u>Id.</u>).

On June 17, 2004, Christon was treated for moderate exertional dyspnea. (R. at 274). His physical examination showed no abnormalities. (<u>Id.</u>). Christon's EKG was abnormal, with left axis deviation, right bundle branch block, and left ventricular hypertrophy with QRS widening and repolarization abnormality. (R. at 312).

On July 20, 2004, Christon was treated for exertional dyspnea. (R. at 273). A physical examination revealed that Christon was normally developed, well-nourished, and appeared to be in good health. (<u>Id.</u>). His systems were normal, although his blood pressure was slightly high. (<u>Id.</u>). A defibrillator check showed a small amount of atrial flutter of very brief duration. (<u>Id.</u>).

On January 3, 2005, Dr. McGrew examined Christon. Christon's systems were normal, but Dr. McGrew noted that Christon's ejection fraction had been as high as forty-five. (R. at 396). On February

4, 2005, Dr. McGrew wrote the following note: "Michael Christon is a patient under my care and should be considered totally and permanently congestive heart failure [sic]." (R. at 394).

On February 10, 2005, Christon was admitted to Baptist. (R. at 363). He was diagnosed with chronic gastritis, and helicobacter pylori was not present. (R. at 386). On February 12, 2005, Christon was admitted to Baptist, and cardiac catheterization was conducted on February 14. (R. at 382). The results showed normal left ventricular volume, left ventricular hypertrophy, overall ejection fraction estimated at 30%, and LVEDP at 13 mmHg. (Id.). Additionally, Christon's left anterior descending coronary artery exhibited a 20-30% proximal irregular area of plaquing followed by more regular areas of 20-30% atenosis distally. (Id.). His circumflex coronary artery exhibited moderate, diffuse plaquing of 20-30% with no hemodynamically significant stenosis. (Id.). Otherwise his heart was normal. (Id.). The diagnostic conclusions were normal left ventricular volume with moderate reduction in left ventricular systolic function in a global fashion, moderate left ventricular hypertrophy, minimally elevated left ventricular end diastolic pressure ("LVEDP"), no significant left main disease, moderate plaquing of the left anterior descending coronary artery ("LAD"), moderate plaquing of the circumflex, no significant RCA disease, no significant right frontoanterior ("RFA") disease, and successful Angio-Seal of the RFA with complete hemostasis. (R. at

384).

Christon was treated at the Med on April 3, 2005, and he was admitted to Methodist from April 6, 2005, until April 13, 2005, due to heart failure. (R. at 367). The records for these treatments are incomplete.

**C.   Christon's Allegations of Disability**

In his Disability Reports, Christon claimed that he suffers from heart problems, use of a defibrillator, shortness of breath, chest pain, memory loss, nervousness, problems sleeping, loss of use of his left arm, and swelling in his legs since December of 2001. (R. at 140, 148). He stated that his conditions affect his ability to work because he tires quickly upon exertion, he has limited strength in his left arm, the fingers in his left hand cannot be extended to open the hand, and he cannot grip or hold anything heavier than a pen with his left hand. (R. at 148, 157). He also stated that his conditions cause pain. (R. at 148). He claimed that his conditions first bothered him on April 19, 1989, and he became unable to work on December 14, 2001. (R. at 157). Christon claimed that he had to make job-related changes due to his condition because his left arm ached more during the winter months, he had worked less during the previous three years, he was hospitalized a couple of times during 2000, and he lost his job because of excessive absences. (R. at 158). He stated that he stopped working due to his heart problems. (Id.).

On August 9, 2004, Christon completed a Fatigue Questionnaire. (R. at 172-73). He stated that he got up in the morning and went to bed at different times each day. (R. at 172). He stated that he did not take naps during the day but he had trouble sleeping. (Id.). Additionally, he stated that he did not take medication to help him sleep. (Id.). Christon claimed that he had difficulty cleaning himself. (Id.). Christon stated that he had trouble finishing a task or chore because of his breathing problems. (Id.). He stated that his step-children and girlfriend prepared his meals for him and that his step-children helped him with his shopping. (Id.). He claimed that he was not able to do any household chores. (Id.). Christon also stated that he spent his time watching television, and he claimed that he could only be active for two to three minutes before having to rest. (R. at 173). He reported that he visits others, and he rides the bus to get around. (Id.). He stated that the only help he needs when he goes out is a ride. (Id.). He claimed that his only activity is attending church and that his life changed since his conditions started because he no longer feels like doing anything. (Id.). He stated that his condition keeps him from working because of his pacemaker and shortness of breath. (Id.).

Christon completed a Pain Questionnaire on August 9. (R. at 174-77). He stated that his pain began on December 15, 2001, and it was located in his legs, arm, and chest. (R. at 174). He

stated that it occurs when he moves around, walks up stairs, and when he is under stress. (_Id._). He stated that the pain is intermittent and that his medication does not relieve it. (_Id._). He claimed that his medication caused him to be lazy and tired and that it affects his memory. (_Id._). He stated that he uses a defibrillator to relieve his pain and that he lays down with pillows behind his head to relieve his pain. (R. at 175). He stated that the pain has changed everything in his life since its onset. (_Id._). He said that he has to "take it slow and easy" in performing daily activities and that he cannot do the things he used to do because of his pain. (_Id._). Finally, he stated that the pain is unbearable at times. (R. at 177).

**D.   Work History and Vocational Analysis**

Christon's past work experience includes working as a cattle herder, concrete spreader, machine maintenance worker, motel construction worker, painter, rubber cutter and cooker, sander, tire repairer, welder, and wood pallet builder. (R. at 158-59). On September 26, 2003, K. Eddie, Tennessee Department of Human Services Case Consultant, completed a Vocational Analysis for Christon. (R. at 170-71). Eddie found that Christon's RFC was limited to frequent fingering on the right hand and that he should avoid concentrated exposure to fumes, odors, and dusts. (R. at 170). Eddie found that Christon's work as a painter, tire repairer, and concrete spreader were considered relevant. (_Id._).

Eddie found that Christon could not perform his past relevant work but that his skills were transferable to the occupations of grocery bagger, stacker, and bag cutter. (R. at 171). Eddie also noted that the framework of Rule 203.36 of the Medical Vocational Guidelines ("the Grid") of Appendix 2 of Subpart P of the regulations was applicable. (Id.).

**E.    Disability Determinations**

Disability Examiner A. Vick and Dr. Robert Tosh completed a Disability Determination for Christon on September 24, 2003. (R. at 53-54). They gave him a primary diagnoses of recurrent arrhythmias and a secondary diagnosis of leg trauma. (R. at 53). They concluded that, although Christon did have leg and arm pain, the evidence showed that he was able to stand, move about, and use his arms, hands, and legs in a satisfactory manner. (R. at 54). Further, they found that testing showed that Christon's heartbeat and function were satisfactory for many normal activities and that the medical records did not reveal complications that would be disabling. (Id.). They also stated that although Christon's condition kept him from performing his past work, it did not prevent him from performing other jobs that were less demanding. (Id.). Finally, they concluded that Christon's condition was not severe enough to keep him from working. (Id.).

Disability Examiner Alan C. Sharp and Dr. Frank Pennington completed Christon's Disability Determination on August 19, 2004.

(R. at 51-52).  They also gave him a primary diagnosis of recurrent arrhythmias and a secondary diagnosis of leg trauma.  (R. at 51).  They reached the same findings and conclusions as the September 26, 2003, Disability Determination.  (R. at 52).

**F.  Administrative Hearing**

An administrative hearing was held on June 21, 2005, before ALJ Zisook.  (R. at 398-418).  Christon appeared in person and was represented by attorney Chris Cornaghie.  (R. at 398).  The ALJ examined Christon first.  (R. at 401).  Christon testified that he was forty-four years old at the time of the hearing.  (Id.).  He also stated that he had completed the eighth grade.  (Id.).  Christon testified that he did not have his GED, he had not been in the military, but he had participated in Job Corps.  (R. at 401-02).  Christon stated that he lived in a first-floor apartment with his girlfriend.  (R. at 402).  Christon also testified that he had two daughters, both fourteen years old, who lived with their mothers in Mississippi.  (Id.).

Christon testified that the last time he worked was in December of 2001, and he had no current source of income.  (R. at 402-03).  He had last worked at Goodyear Tire Company for one year, where he was required to be on his feet and to lift from sixty to eighty pounds.  (R. at 403).  Previous to that job, Christon worked at a tire service center, where he was required to lift passenger car tires weighing between forty and fifty pounds.  (Id.).

Christon stated that he last held a job that did not require heavy lifting when he was about twenty-eight years old. (R. at 403-04).

Upon examination by his attorney, Christon testified that he became disabled on December 14, 2001, when he had a heart attack. (R. at 404). He stated that he had filed an application for disability benefits in 1991. (Id.). Christon also stated that he was hospitalized for his heart attack for approximately fifteen days, he had surgery to implant a pacemaker, and that he had additional surgeries to remove lymph nodes and to treat stomach inflammation. (R. at 404-05). He testified that in April of 2005, Dr. McGrew had performed surgery on him involving three cardiac catheters. (Id.).

Christon stated that his heart problem kept him from working because his heart muscles have deteriorated, which caused a fast heart rate of up to 130 beats per minute. (R. at 406). He stated that his pacemaker goes off when his heart rate reaches 130 beats per minute and that it has gone off "numerous times" and up to "five times back to back," although he indicated that it had not gone off in the past two months. (R. at 406-07). Christon testified that he was taking medication for high blood pressure, potassium pills, Zocor, Furosemide, and nitroglycerin. (R. at 407). He stated that he took twelve pills per day. (Id.). Christon testified that he experienced chest pain almost every night when he lies down, and he puts his arms up and elevates

himself to alleviate the pain. (Id.). Christon stated that he was going to have surgery in the future to change the battery in his pacemaker and to put another lead on the pacemaker because the bottom part of his heart had started fluttering. (R. at 408). Additionally, he stated that he was going to have surgery on his stomach. (Id.).

Christon stated that he could dress, bathe, and shave himself, and he could go to the grocery store with his girlfriend. (R. at 408). He testified that he could drive, but he did not have a car. (Id.). He stated that he could stand for thirty minutes at a time and sit for an hour at a time. (R. at 408-09). Christon testified that he spent a total of four hours resting throughout the day, and he stated that he had trouble sleeping at night. (R. at 409). Christon also testified that he had lost weight as a result of his medication. (Id.). Christon stated that he had not seen a doctor for two months because he could not pay for his treatment. (Id.).

Christon testified that he had been injured in 1989 on his left side and in both of his legs. (R. at 409-10). He stated that he could not open his left hand because the tendons were damaged. (R. at 410). He stated that he was able to work at his past jobs despite his injuries because "I had no source of income. I had to try to do the best I could, you know. . . . and [have] a good attitude on the job that I would be on." (Id.). He stated that he needed treatment for the problems resulting from his injury but did

not have medical insurance. (Id.). He stated that he wanted to return to work but could not. (Id.). Christon testified that he did not have enough energy to do anything, and he was sometimes uncomfortable sitting or standing due to chest pains. (Id.).

Upon further examination by ALJ Zisook, Christon stated that he could sit without discomfort for about thirty minutes. (R. at 410). He described the discomfort as tightness in his stomach and pressure in his chest. (R. at 411). He testified that he did not know what caused the tightness in his stomach, and he could not afford to have an examination. (Id.). Christon stated that his stomach problems had been getting worse for about six months. (Id.). He also stated that he could stand for about thirty minutes at a time. (Id.). He said that getting up and walking around for a minute helped with his discomfort from sitting. (Id.). He stated that he could not lift anything because he could not use his left arm to lift things. (Id.). He said that he had no muscles in his arm, and his attorney stated that they would submit photographs taken the previous day to show the extent of the injury.[3] (R. at 411-12).

Christon testified that he could no longer work because he becomes short-winded when he moves around and could not climb a flight of stairs without having to stop. (R. at 412). He stated that he spent the day watching television. (R. at 413). He

---

[3]No photographs were included in the record.

testified that he took out the trash and that he could go to the refrigerator and take out a gallon of milk or a pitcher of lemonade. (<u>Id.</u>). He also stated that he had problems with zippers on his clothes because he could not use both of his hands. (<u>Id.</u>). He said that he had to use his right hand to move his left hand around. (<u>Id.</u>). Christon stated that he could hold things with his left hand, but he could not flex or reach with it or turn it all the way over. (R. at 414). He stated that he shops with his girlfriend and that his daughters took them to the grocery store. (<u>Id.</u>).

Christon testified that the last time he saw a doctor was on May 2, 2005. (R. at 414). He stated that until that time, he saw a doctor every month. (R. at 414-15). Christon stated that he was placed in an experimental drug program that did not work for him. (R. at 415). He also stated that he took a stress test when he was hospitalized in April of 2005 but that he did not last more than five seconds. (<u>Id.</u>). Christon testified that he had tried to go to free clinics, but they would not see him. (<u>Id.</u>).

Christon's attorney asked for thirty days to get a statement from Dr. McGrew's office because he was trying to arrange to do so without paying a medical bill. (R. at 415). ALJ Zisook requested that Christon's attorney get records from Dr. McGrew for the six month period after July 20, 2004, during which time he continued to see Christon. (R. at 416). The ALJ kept the record open for

thirty days to receive updated medical records.  (R. at 418).

## G.    The ALJ's Decision

ALJ Zisook issued his decision denying Christon's claim on January 24, 2006.  (R. at 12-33).  Applying the five-step sequential disability analysis,[4] the ALJ found at step one that Christon had not engaged in substantial gainful activity since the alleged disability onset date.[5]  (R. at 18).  At step two, the ALJ found that Christon's medically determinable impairments, history of congestive heart failure status post pacemaker/AICD, cardiomyopathies, and recurrent arrhythmias, were severe

---

[4]Entitlement to Social Security disability benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations.  20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months.  20 C.F.R. § 404.1520(c).  Second, a finding must be made that the claimant suffers from a severe impairment.  Id.  Third, the ALJ must determine whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations.  20 C.F.R. §§ 404.1520(d), 404.1525, 505.1526.  If the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the residual functional capacity to return to any past relevant work.  20 C.F.R. § 404.1520(e).  If the ALJ finds the claimant unable to perform past relevant work, then, at the fifth step, the ALJ must determine whether the claimant can perform other work which exists in significant numbers in the national economy.  20 C.F.R. § 404.1520(f).

[5]The ALJ noted that review of Christon's earnings records indicated that he was only insured for disability insurance benefits through December 31, 2005, which meant that in order to be entitled to a period of disability or disability insurance benefits, Christon had to establish that he was disabled on and/or prior to December 31, 2005.  (R. at 16).  The ALJ also noted that SSI benefits were not affected by insured status requirements.  (Id.).

impairments within the meaning of the Social Security Act and Regulations. (R. at 19); 20 C.F.R. §§ 404.1520(c) and 416.920(c).

At the third step, the ALJ concluded that the medical evidence indicated that the severity of Christon's medically determinable impairments did not meet or medically equal the severity of Listing 4.05, Recurrent Arrhythmias, or any other impairments listed in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (R. at 24); 20 C.F.R. §§ 404.1520(d), 416.920(d). He noted that the record contained no evidence that either Dr. Coppess or Dr. McGrew had imposed any significant limitations on Christon's ability to function. (R. at 21, 24). The ALJ also noted that Christon had a normal physical examination on January 3, 2005 and that during his hospitalization on February 14, 2005, Dr. Wolford found normal ventricular volume with moderate reduction in left ventricular systolic function, moderate left ventricular hypertrophy, no significant left main disease, moderate plaquing of the LAD and the circumflex, and no significant coronary artery disease. (R. at 24).

The ALJ noted that in April of 2002, a non-examining state agency consultant found that Christon had the RFC for a wide range of sedentary exertional work. (R. at 25). He also noted that Dr. McGrew's June 17, 2002, treatment notes showed that Christon's AICD was functioning well, he had normal paroxysmal atrial fibrillation, and he had a normal ejection fraction. (R. at 26). He also found

that Dr. Siegel noted marked calluses on Christon's right palm and moderate calluses on his left palm, which indicated that Christon could use both of his hands. (Id.). The ALJ found that physical examinations from 2001 until 2005 were generally unremarkable, and that a catheterization study in February of 2005 was nearly normal. (R. at 26-27). The ALJ also found that Christon cooked, washed dishes, vacuumed, loaded the washer and dryer, cared for his personal needs and grooming but had trouble with zippers, took out the trash, could lift and carry a gallon of milk, drove, and shopped, but did not do any outdoor chores. (R. at 27). The ALJ found that this evidence supported the conclusion that Christon retained the RFC for a wide range of sedentary exertional work in spite of his pain and discomfort from his heart problems and left leg and left arm trauma. (Id.).

Next, at step four, the ALJ determined whether Christon could return to his past relevant work. (R. at 27-28); 20 C.F.R. § 416.920(a)(4)(iv). The ALJ found that Christon had presented objective medical evidence that he had medically determinable severe impairments that could reasonably be expected to produce mild to moderate pain and discomfort and significant exertional limitations in Christon's ability to perform basic work activities, but not to the extent that Christon alleged. (R. at 25). The ALJ found that Christon's allegations that he was only able to stand or sit for thirty minutes at a time, had shortness of breath when he

moved around, was unable to walk up a flight of stairs, could not lift his left arm, had difficulty sleeping, and had to rest for four hours during the day, were not supported by the objective medical evidence. (Id.). The ALJ also stated that he considered the opinions of the non-examining State Agency medical consultants who reviewed Christon's medical records and completed an RFC assessment on September 25, 2003. (R. at 30). He added, however, that additional evidence received after the date of the State Agency reconsideration, and the ALJ's own observation of Christon during the hearing, showed that the severity of Christon's impairments were more limiting than the State Agency examiners had concluded. (Id.).

The ALJ stated that he considered Dr. McGrew's opinion that Christon "was totally and permanently disabled."[6] (R. at 28). The ALJ found that Dr. McGrew's opinion related to a finding of fact reserved to the Commissioner, was not supported by Dr. McGrew's own findings, and was inconsistent with other evidence in the record as well as Christon's own statements about his abilities to perform basic activities of daily living. (Id.). In addition, the ALJ found that Dr. McGrew had not imposed any restrictions or limitations on Christon's activities. (Id.). Therefore, he did not give Dr. McGrew's opinion controlling weight. (Id.).

---

[6]Dr. McGrew's letter of February 4, 2005, stated "Michael Christon is a patient under my care and should be considered totally and permanently congestive heart failure." (R. at 394).

The ALJ determined that Christon could lift and/or carry ten pounds, stand and/or walk for at least two hours in an eight-hour day, and sit for six hours in an eight-hour day. (R. at 27). He also found that Christon retained the RFC to perform postural activities occasionally. (Id.). Therefore, the ALJ concluded that Christon retained the RFC for sedentary exertional work. (Id.). The ALJ noted that Christon's past relevant work as a tire repairer, sander, factory worker, painter, stone mason helper, and concrete spreader, was generally medium to heavy exertional, unskilled to semi-skilled work. (R. at 16-17). Thus, the ALJ concluded that Christon could not perform his past relevant work. (R. at 29).

The ALJ stated that under step five, the burden shifts to the Commissioner to show that there are other jobs existing in significant numbers in the national economy that Christon can perform, consistent with his RFC, age, education, and work experience. (R. at 29); 20 C.F.R. § 416.920(a)(4)(v). The ALJ noted that Christon's age, education, and vocationally relevant work experience, if any, must be viewed in conjunction with the Grid. (R. at 29). The ALJ found that at his alleged disability onset date, Christon was forty years old and a "younger individual age 18-44" under the regulations, and as of the date of his decision, Christon was a "younger individual age 45-49" under the regulations. (Id.). Christon could read, write, and speak

English, and he had completed the eighth grade, which meant that he had a "limited education." (Id.). Additionally, the ALJ noted that Christon had a semi-skilled work background, but transferability of skills was not an issue in the case. (Id.). The ALJ concluded that, based on his review of all of the evidence, there were other jobs that exist in significant numbers in the regional and national economy that Christon could perform, and therefore, he was not disabled. (R. at 29-30). The ALJ noted that the framework of Rules 201.25 and 201.19 of the Grid also supported his conclusion. (R. at 30).

## II.   PROPOSED CONCLUSIONS OF LAW

In his appeal, Christon contends that the ALJ made a number of errors in his decision: (1) failing to assign any limitations to Christon despite his upper left extremity impairment; (2) discrediting Dr. McGrew's opinion and failing to contact him for clarification as to specific limitations associated with Christon's heart condition; (3) failing to incorporate the environmental limitations associated with having an AICD; and (4) mechanically relying on the Grid despite the presence of nonexertional limitations. Christon requests that the court remand his case and order the ALJ to obtain vocational expert testimony.

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the Commissioner's

decision, 42 U.S.C. § 405(g); <u>Drummond v. Comm'r of Soc. Sec.</u>, 126 F.3d 837, 840 (6th Cir. 1997), and whether the correct legal standards were applied. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986). When the record contains substantial evidence to support the Commissioner's decision, the decision must be affirmed. <u>Stanley v. Sec'y of Health & Human Servs.</u>, 39 F.3d 115, 117 (6th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401 (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. <u>Abbott v. Sullivan</u>, 905 F.2d 918, 923 (6th Cir. 1990). When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994). Similarly, the court may not try the case <i>de novo</i>, resolve conflicts in the evidence, or decide questions of credibility. <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994).

## B.    Left Arm and Hand Injury

Christon first claims that the ALJ erred in failing to assign

any limitations due to impairment of his left arm and hand and in failing to make any findings of fact regarding Christon's manipulative limitations. The court finds that substantial evidence supports the ALJ's decision to not assign any exertional limitations based on the injury to Christon's left arm and hand. First, Christon sustained the injury in 1989, yet he was able to perform medium to heavy exertional work as recently as 2000 and 2001 as a tire repairer. See Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995) (finding substantial evidence supported the ALJ's finding that plaintiff was not disabled in part because the record showed that plaintiff worked for several years while suffering from ailments she asserted were disabling); Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (same); Fraga v. Bowen, 810 F.2d 1296, 1305 n.11 (5th Cir. 1987) (same).

Second, neither Christon's treating physicians nor the state agency consultative examiners restricted Christon's daily activities due to his left arm or hand. Although Dr. Siegel's examination showed that Christon's left elbow had only 10 degrees of supination and zero degrees of extension, it had seventy degrees pronation, and 125 degrees of flexion. Additionally, Christon's grip strength was 4/5 in his left hand. Third, Christon's activities of daily living were inconsistent with the level of exertional impairment he claims regarding his left arm and hand. Although Christon stated at the hearing that he had trouble with

zippers, he could bathe and dress himself and he could lift and carry a gallon of milk. He also stated that he could cook, wash dishes, vacuum, load the clothes washer and dryer, and drive. Finally, the ALJ did account for Christon's arm and hand injury when he made the RFC assessment. The ALJ stated that Christon could perform sedentary exertional work "in spite of the pain/discomfort from his heart problems, left leg and left arm trauma." (R. at 27). In addition, the ALJ took Christon's arm injury into account in his RFC assessment that Christon was limited to lifting ten pounds. Therefore, the court finds that substantial evidence supports the ALJ's decision to not assign any exertional limitations to Christon due to his left arm and hand injury. Nonexertional, manipulative limitations due to his hand injury will be addressed below.

## C. Dr. McGrew's Opinion

Next, Christon argues that the ALJ erred in discrediting Dr. McGrew's opinion and in failing to contact him for clarification as to specific limitations associated with Christon's heart condition. If a treating or examining physician's opinion is rejected by the ALJ, then the ALJ must present some basis for rejecting it. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987). Generally, "[t]he medical opinion of a treating physician is to be given substantial deference." Walker v. Health & Human Servs., 985 F.2d

1066, 1070 (6th Cir. 1992); <u>see also</u> 20 C.F.R. § 404.1527(d)(2).[7]

The court, however, "is not bound by a treating physician's conclusory statement." <u>Duncan v. Sec'y of Health & Human Servs.</u>, 801 F.2d 847, 855 (6th Cir. 1986). A treating physician's opinion receives controlling weight only when it is supported by sufficient clinical findings and is consistent with the evidence, <u>see</u> 20 C.F.R. § 404.1527(d)(2); <u>Cutlip</u>, 25 F.3d at 287, and lack of "detailed, clinical, diagnostic evidence" can render a treating physician's opinion less creditworthy. <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 530 (6th Cir. 1997). Although the ALJ is not bound by a treating physician's opinion, "he must set forth the

---

[7]20 C.F.R. § 404.1527(d)(2) provides as follows:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

reasons for rejecting the opinion in his decision." <u>Culbertson v.</u>
<u>Barnhart</u>, 214 F. Supp. 2d 788, 797 (N.D. Ohio 2002) (citing
<u>Shelman</u>, 821 F.2d at 321).

The court submits that substantial evidence supports the ALJ's
determination that Dr. McGrew's opinion regarding Christon's heart
condition is not supported by sufficient medical data. Dr. McGrew,
Christon's treating physician, did not complete an RFC assessment,
but he did provide the ALJ with a letter stating that "Michael
Christon is a patient under my care and should be considered
totally and permanently congestive heart failure [sic]." (R. at
394). Dr. McGrew's opinion was conclusory and any lacked detailed,
clinical, diagnostic support. Furthermore, Dr. McGrew's own clinic
notes indicate that he did not impose any restrictions on
Christon's daily activities and that Christon's physical
examinations were generally unremarkable. Dr. McGrew did find that
Christon experienced exertional dyspnea and occasional
palpitations, but Christon's ejection fraction had improved.
Therefore, the court submits that substantial evidence supports the
ALJ's rejection of Dr. McGrew's opinion because it was not based on
detailed, clinical, diagnostic evidence. <u>See</u> <u>Harris v. Heckler</u>,
756 F.2d 431, 435 (6th Cir. 1985) (stating that the treating
physician's opinion is only accorded substantial deference if it is
based on sufficient medical data and that "the determination of
disability is the prerogative of the [Commissioner], not the

treating physician").

Moreover, the ALJ was not required to contact Dr. McGrew for clarification regarding Christon's limitations. "Generally, an [ALJ] need recontact a medical source only if the evidence received from that source is 'inadequate' for a disability determination." DeBoard v. Comm'r of Soc. Sec., 211 Fed. Appx. 411, 416 (6th Cir. 2006); 20 C.F.R. § 404.1512. The record contained sufficient medical evidence from Dr. McGrew's treatment of Christon to allow the ALJ to make a disability determination, including almost three years worth of medical records from Dr. McGrew's office.

**D. Environmental Limitations Due to the AICD**

Christon next argues that the ALJ erred in failing to incorporate the environmental limitations associated with having an AICD into his RFC assessment. The court submits that although the ALJ erred in failing to incorporate such environmental limitations, that error was harmless and does not alone warrant remand. The record does not show that Christon's treating physicians or the state agency consultative examiners placed any environmental restrictions on Christon based on his AICD. Further, restrictions imposed by AICDs, such as avoiding microwaves, radar, machinery, and magnets, are "so limited that they would not significantly restrict the number of jobs available in the national economy." Nuckols v. Bowen, No. 88-2923, 1989 WL 54063, at *2 (4th Cir. May 16, 1989); see also Pouska v. Apfel, No. 99 C 805, 2000 WL 1347892,

at *7 n.24 (N.D. Ill. Sept. 19, 2000). Therefore, any environmental limitations imposed by Christon's AICD would not significantly restrict the number of jobs available in the national economy at the sedentary exertional level, and the ALJ's failure to incorporate such limitations is harmless error.

**E.    Nonexertional Limitations**

Finally, Christon argues that the ALJ erred in mechanically relying on the Grid despite the presence of nonexertional limitations, including fatigue, chest pain, dyspnea, left upper extremity limitations, and environmental limitations. As discussed above, at step five of the disability analysis, the burden shifts to the Commissioner to show that there are other jobs existing in significant numbers in the national economy that the claimant could perform consistent with his functional limitations, age, education, and work experience. Gill v. Astrue, No. 04-2430-MaV, 2007 WL 2692171, at *6 (W.D. Tenn. Sept. 12, 2007); Abbott, 905 F.2d at 926; 20 C.F.R. § 416.920(a)(4)(v). In making this determination, the Commissioner can usually carry his burden by using the Grid or through expert testimony. Gill, 2007 WL 2692171, at *6. The Grid allows the Commissioner to take administrative notice that the claimant has met the requirements to perform certain jobs in the economy. Abbott, 905 F.2d at 923. The Grid provides information

for only exertional limitations.[8]  Id. at 926.

Often, the Grid may direct a finding of disabled or not disabled based on the claimant's age, education level, and transferable work skills.  Abbott, 905 F.2d at 926.  If any of the findings of fact do not exactly coincide with the Grid's definitions, the ALJ may only use the Grid as a framework, and expert testimony or some other reliable evidence would be required to satisfy the Commissioner's burden.  Gill, 2007 WL 2692171, at *6; Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 531 (6th Cir. 1981).  Additionally, if a claimant's nonexertional limitation is found to significantly limit the claimant's ability to do a full range of work at the designated level, then relying exclusively on the Grid is inappropriate.  Abbott, 905 F.2d at 926; Buress v. Sec'y of Health & Human Servs., 835 F.2d 139, 142 (6th Cir. 1987); Cole v. Sec'y of Health & Human Servs., 820 F.2d 768, 771 (6th Cir. 1987); Kimbrough v. Sec'y of Health & Human Servs., 801 F.2d 794, 796 (6th Cir. 1986); Damron v. Sec'y of Health & Human Servs., 778 F.2d 279, 282 (6th Cir. 1985); Kirk, 667 F.2d at 528.  In that instance, the Grid does not direct a conclusion of nondisability, it may only be used as a framework, and expert testimony may be necessary to assist the ALJ in making a disability determination.

[8]Exertional limitations "affect your ability to meet the strength demands of jobs."  20 C.F.R. § 416.969a(a).  Nonexertional limitations are "[l]imitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional."  Id.

<u>Gill</u>, 2007 WL 2692171, at *6; <u>Abbott</u>, 905 F.2d at 926-27; <u>Kirk</u>, 667 F.2d at 528.

A mere allegation of a nonexertional limitation is not sufficient to preclude the use of the Grid; instead, it must be determined that it is a "significant" nonexertional limitation. <u>Gill</u>, 2007 WL 2692171, at *6; <u>Buress</u>, 835 F.2d at 142-43; <u>Cole</u>, 820 F.2d at 772; <u>Kimbrough</u>, 801 F.2d at 798; <u>Kirk</u>, 667 F.2d at 537. This means that the nonexertional limitation must be severe enough to restrict a full range of gainful employment at a designated level. <u>Cole</u>, 820 F.2d at 772, n.2; <u>Kirk</u>, 667 F.2d at 537.

Although the ALJ states that he used the Grid as a framework only, it appears that he relied exclusively on the Grid in determining that Christon was not disabled. The ALJ concluded that

> given the claimant's age, education, past work experience and residual functional capacity assessment in this case, that there are other jobs that exist in significant numbers in the regional and national economy that the claimant can perform. Since the claimant can perform other work that exists in significant numbers in the regional and national economy he is "not disabled" within the meaning of the Social Security Act and Regulations. The framework of Rules 201.25 and 201.19 of the Medical-Vocational Guidelines also support a conclusion that there are other jobs that exist in significant numbers in the regional or national economy that the claimant can perform.

(R. at 29-30). Thus, the ALJ simply stated the categories that the Grid is based on – age, education, past work experience, and RFC – and that the framework of the Grid supported his conclusion. <u>See</u> <u>Abbott</u>, 905 F.2d at 927 (stating that although "the word

'framework' appears in [the Appeals Council's] next reference to the rule, a fair reading of the record reveals that the Council relied entirely on the [G]rid"). The ALJ provided no additional evidence or expert testimony to support his conclusion, which indicates that he relied exclusively on the Grid.

Christon claims to suffer from the nonexertional impairments of fatigue, chest pain, dyspnea, left upper extremity limitations, and environmental limitations. As stated above, a mere allegation of a nonexertional limitation is not sufficient to preclude the use of the Grid. Gill, 2007 WL 2692171, at *6; Buress, 835 F.2d at 142-43; Cole, 820 F.2d at 772; Kimbrough, 801 F.2d at 798; Kirk, 667 F.2d at 537. Christon must show that these impairments are "significant" nonexertional limitations in order to demonstrate that the ALJ's reliance on the Grid was improper. Gill, 2007 WL 2692171, at *6; Buress, 835 F.2d at 142-43; Cole, 820 F.2d at 772; Kimbrough, 801 F.2d at 798; Kirk, 667 F.2d at 537. First, although Christon claims to suffer from fatigue, there is no evidence in the medical records that he has received any medical treatment for fatigue or that he complained of fatigue to his health care providers. The absence of treatment or failure to seek treatment may indicate that a claimant does not suffer from the alleged impairment. See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). Therefore, the court submits that there is no evidence that fatigue is a significant nonexertional impairment in this case.

Christon also claims that he suffers from chest pain and dyspnea. The medical records establish that Christon suffers from these conditions as Christon sought treatment for these conditions a number of times. Therefore, the court submits that the ALJ should have determined whether Christon's chest pains and dyspnea are significant nonexertional impairments.

Next, Christon claims that his left upper extremity limitation precludes application of the Grid. Although, as stated above, his left arm and hand injury is not a disabling exertional limitation, it may be a significant nonexertional limitation. In an RFC assessment, Dr. Tilley found that Christon was limited in his fingering ability, and a state case consultant limited Christon to frequent fingering with his right hand only. In addition, a disability examiner observed that Christon had difficulty using his hands and could not extend the fingers of his left hand, and x-rays showed abnormalities in his left hand. According to SSR 96-9p,

> Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. . . . When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

SSR 96-9p. The ALJ did not address the manipulative limitations in Christon's left hand. Therefore, the court recommends that, on remand, the ALJ determine whether Christon's nonexertional

manipulative limitations are significant.

Finally, Christon argues that the ALJ should have considered the environmental limitations imposed in his RFC assessments, including avoiding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. "Restrictions to avoid exposure to odors or dust must also be evaluated on an individual basis." SSR 96-9p. Therefore, the court submits that the ALJ should determine on remand whether these limitations are significant.

In sum, the court recommends that the case be remanded for further proceedings in order for the ALJ to make specific findings under step five, including specific findings relating to Christon's nonexertional limitations, whether those limitations are significant, and whether there are jobs existing in significant numbers in the national economy that Christon could perform consistent with his functional limitations, age, education, and work experience. The Commissioner may not rely exclusively on the Grid if Christon's nonexertional limitations are significant, and under those circumstances, must offer testimony from a vocational expert or other reliable evidence.

### III.   RECOMMENDATION

For the reasons above, the court recommends that the Commissioner's decision be remanded for further proceedings consistent with this report and recommendation.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

August 13, 2008
Date


**NOTICE**

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.